UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| JEFFREY P. JANNETT, on behalf of himself and all others similarly situated,<br><br>                 Plaintiff,<br><br>v.<br><br>R&G FINANCIAL CORP., VICTOR J. GALAN, JOSEPH R. SANDOVAL AND RAMON PRATS,<br><br>                 Defendants. | Civil Action No. 05-1485 JAF<br><br>JURY TRIAL DEMANDED<br><br>RECEIPT # 155011<br>AMOUNT: $250.00<br><br>MAY - 6 2005<br><br>CASHIER SIGNATURE |

## CLASS ACTION COMPLAINT

Plaintiff makes the following allegations, except as to allegations specifically pertaining to Plaintiff and Plaintiff's counsel, based upon the investigation undertaken by Plaintiff's counsel, which investigation included analysis of news articles and reports, public filings, press releases and other matters of public record.

## NATURE OF THE COMPLAINT

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the publicly traded securities of R&G Financial Corp. ("R&G" or the "Company") during the period of April 21, 2003, through April 25, 2005, inclusive, (the "Class Period") under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and the regulations promulgated thereunder by the SEC, including Rule 10b-5.

2.      As discussed in more detail below, Defendants issued, or caused to be issued, false and misleading statements during the Class Period to artificially inflate the value of R&G stock.  More specifically, the Company failed to disclose and misrepresented the following

material adverse facts which were known to defendants or recklessly disregarded by them: (1) that R&G Financial's earnings quality had been significantly weakened by the Company's use of more aggressive assumptions to generate gain on sale income, as well as to the value it retained in its interest only ("IO") residuals in securitization transactions; (2) that R&G Financial's methodology used to calculate the fair value of its IO residual interests retained in securitization transactions was incorrect and caused the Company to overstate its financial results by at least $50 million; (3) that the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); (4) that the Company lacked adequate internal controls and was therefore unable to ascertain the true financial condition of the Company; and (5) that as a result, the value of the Company's net income and financial results were materially overstated at all relevant times.  On April 25, 2005, after the market had closed, R&G Financial announced that it would restate its financial results for fiscal years 2003 and 2004.  Shares of R&G Financial fell $8.14 per share, or 35.12 percent, on April 26, 2005, to close at $15.04.  A few hours after trading had concluded for the day, R&G issued a press release announcing that it was the subject of an informal SEC investigation related to it restatement announcement.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.  The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5 (17 C.F.R. §240.10b-5).

4.      Venue is proper in this district pursuant to Section 27 of the Exchange Act (28 U.S.C. §1391(b)).  Many of the acts and transactions giving rise to the violations of law

complained of herein, including the preparation and dissemination to the investing public of false

and misleading information, occurred in this district.  In addition, R&G maintains its principal

executive offices in this district.

5.      In connection with the acts, conduct and other wrongs complained of herein,

Defendants used the means and instrumentalities of interstate commerce, including the mails,

telephone and the facilities of national securities exchanges.

**THE PARTIES**

**A.      Plaintiff**

6.      Plaintiff Jeffrey P. Jannett purchased R&G common stock during the Class

Period, as evidenced by his certification attached hereto.

**B.      Corporate Defendant**

7.      Defendant R&G's principal offices are located at 280 Jesus T. Pinero Avenue,

Hato Rey, San Juan, PR 00918.  The Company provides the following description of its services:

> R&G Financial Corporation (R&G Financial) is a Puerto Rico-chartered, financial holding company that operates R-G Premier Bank of Puerto Rico (Premier Bank) a Puerto Rico commercial bank, and R-G Crown Bank (Crown Bank), a Florida domiciled federal savings bank. The Company also operates R&G Mortgage Corp (R&G Mortgage) in Puerto Rico, The Mortgage Store of Puerto Rico, Inc. (Mortgage Store), a subsidiary of R&G Mortgage and Continental Capital Corp. (Continental), a mortgage-banking subsidiary of Crown Bank, which does business in the continental United States. The Company also conducts an insurance agency business and offers broker dealer services in Puerto Rico through Home & Property Insurance Corp. and R-G Investments Corporation, respectively.
>
> The Company provides a range of banking services through its banking subsidiaries, Premier Bank with 33 branches in Puerto Rico and Crown Bank with 15 branches in Florida. Banking services include commercial banking services, corporate real estate and business lending, residential construction lending, consumer lending and credit cards. It offers a diversified range of deposit products and, to a lesser extent, trust and investment services

3

through its private banking department and broker-dealer. It also provides a range of real estate secured lending activities, including the origination, servicing, purchase and sale of mortgages on single-family residences, the securitization and sale of various mortgage-backed and related securities, the holding and financing of mortgage loans and mortgage-backed and related securities for sale or investment and the purchase and sale of servicing rights associated with such mortgage loans.

**C.    Individual Defendants**

8.    The Individual Defendants, at all times relevant to this action, served in the capacities listed below and received substantial compensation:

| Name | Position |
|------|----------|
| Victor J. Galan | Chairman of the Board and Chief Executive Officer (principal executive officer) |
| Joseph R. Sandoval | Executive Vice President and Chief Financial Officer |
| Ramon Prats | Vice Chairman and President |

## CLASS ACTION ALLEGATIONS

9.    Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") consisting of all persons who purchased the publicly traded securities of R&G between April 21, 2003, and April 25, 2005, inclusive.  Excluded from the Class are the Defendants herein, members of each Individual Defendant's immediate family, any entity in which any Defendant has a controlling interest, and the legal affiliates, representatives, heirs, controlling persons, successors, and predecessors in interest or assigns of any such excluded party.

10.    Because R&G has millions of shares of common stock outstanding, and because the Company's common stock was actively traded on the New York Stock Exchange under the symbol "RGF" throughout the Class Period, members of the Class are so numerous that joinder

of all members is impracticable. While the exact number of Class members is unknown at this time and can only be determined by appropriate discovery, Plaintiff believes that Class members number at least in the thousands and that they are geographically dispersed.

11.     Plaintiff's claims are typical of the claims of the members of the Class, because Plaintiff and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

12.     Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who are experienced and competent in class and securities litigation. Plaintiff has no interests that are contrary to or in conflict with the other members of the Class Plaintiff seeks to represent.

13.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation makes it impossible for the members of the Class individually to redress the wrongs suffered. There will be no difficulty in the management of this action as a class action.

14.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

        a.      whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.       whether the Company's publicly disseminated releases and statements

during the Class Period omitted and/or misrepresented material facts and whether Defendants

breached any duty to convey material facts or to correct material facts previously disseminated;

c.       whether Defendants participated in and pursued the fraudulent scheme or

course of business complained of;

d.       whether Defendants acted willfully, with knowledge or recklessly, in

omitting and/or misrepresenting material facts;

e.       whether the market prices of R&G common stock during the Class Period

were artificially inflated due to the material nondisclosures and/or misrepresentations

complained of herein; and

f.       whether the members of the Class have sustained damages and, if so, what

is the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

**A.       The Class Period Begins**

15.      The Class Period starts on April 21, 2003.  At that time, R&G Financial issued a

press release with the headline "R&G Financial Reports 35% Increase in Earnings for The

Quarter Ended March 31, 2003."  Therein, the Company stated:

> R&G Financial Corporation (NYSE: RGF) ("the Company"), the
> financial holding company of R-G Premier Bank, Crown Bank,
> FSB, and R&G Mortgage Corp., today reported record financial
> results for the quarter ended March 31, 2003. Net income for the
> first quarter of 2003 amounted to $29.1 million, compared to net
> income of $21.5 million for the first quarter of 2002, an increase of
> 35%. For the first quarter of 2003, consolidated earnings per
> diluted share were $0.74, compared to $0.58 per diluted share for
> the first quarter of 2002, an increase of 28%. The Company's ROA
> and ROE improved during the quarter ended March 31, 2003 to
> 1.77% and 21.94%, respectively, from 1.74% and 21.19%,
> respectively, during the quarter ended December 31, 2002.

6

These strong earning results were achieved notwithstanding impairment charges and unscheduled amortization of $10.8 million during the first quarter of 2003 on the Company's servicing asset, related to additional increases in mortgage prepayment rates during the period as a result of lower interest rates available for mortgage loans. The resulting decrease in earnings were more than offset by increases in gain on sale and fees from mortgage loans, which were attributable to record volumes of mortgage loan originations and sales. Total loan production during the first quarter of 2003 was $1.0 billion, of which more than 90% was internally generated. Total loan production was the highest amount for any given quarter in the Company's history, representing a 76% increase compared to the same quarter a year ago.

During the quarter ended March 31, 2003, the Company's net interest income rose to $42.2 million, compared to $32.0 million in the 2002 comparative quarter, an increase of 32%, as a result of a record volume of earning assets. Included in earning assets of the Company at March 31, 2003 were the assets of Crown Bank, the Company's Florida-based banking subsidiary acquired during the second quarter of 2002.

Net gain on origination and sale of loans increased 86% to $33.0 million during the quarter ended March 31, 2003 from $17.7 million for the comparable 2002 period, due to the increased volume of mortgage loan originations and sales as well as higher margins in the sale of loans. This expanded level of loan originations reflects not only the increase in loan production volume due to lower rates for mortgage loans during the period, but also the increased number of mortgage offices of the Company and R&G Financial's added strength in the market for new residential mortgage loans. The Company has obtained a higher share of end loans as a result of R&G's continued growth in residential construction lending, which remains very strong both in Puerto Rico and Central Florida as high demand for housing continues in those markets. Loan originations in the Company's division for new housing during the first quarter of 2003 represented a new record for R&G Financial.

Other fee income for the first quarter of 2003 was $5.7 million, representing a 48% increase over the comparative period in 2002. The increase reflects added contributions made by the Company's insurance agency and its broker-dealer subsidiary.

Mr. Victor J. Galan, Chairman and Chief Executive Officer of the Company, commented on the first quarter results as follows:

"We are very pleased to report these excellent results during the
quarter ended March 31, 2003. The increase in earnings in the first
quarter of 2003 comes after last year's stellar performance in which
we increased profits by 45% to a new record level. More
remarkable is the fact that during the first quarter of 2003 R&G
Financial established a new record for loan production, surpassing
$1 billion for the first time in any given quarter. We achieved
equally positive results with our loan portfolio, retail deposits and
banking assets; total loans and deposits each reached a record $3.0
billion at quarter end, while banking assets surpassed $6.1 billion.

Once again, we demonstrate the complimentary nature among our
product lines, as reflected by continued strength experienced
across all of the Company's segments during the quarter resulting
in record assets, loans and deposits. All these accomplishments
position R&G very well for continued growth, and we remain
optimistic about our future performance. This is now the 13th
quarter in a row that we have achieved uninterrupted consecutive
increases in earnings to record levels, and we will use our best
efforts to continue to do so in the future. We look forward to
adding value and improving returns for our stockholders."

16.     On May 15, 2003, R&G Financial filed its quarterly report with the SEC on Form

10-Q. The Company's Form 10-Q, which reaffirmed the Company's previously announced

financial results, was signed and certified pursuant to sections 302 and 904 of the Sarbanes-

Oxley Act of 2002 by Defendants Galan and Sandoval. Additionally, the defendants represented

the following:

The accompanying unaudited consolidated financial statements
have been prepared in accordance with the instructions for Form
10-Q. Accordingly, they do not include all of the information and
footnotes required by generally accepted accounting principles.
However, in the opinion of management, the accompanying
unaudited consolidated financial statements include all adjustments
(principally consisting of normal recurring accruals) necessary for
a fair presentation of the Company's financial condition as of
March 31, 2003 and the results of operations and changes in its
cash flows for the three months ended March 31, 2003 and 2002.

17.   On July 16, 2003, R&G Financial issued a press release with the headlines "R&G

Financial Reports Record Earnings for Second Quarter and Six Months Ended June 30, 2003."

Therein, the Company stated:

> R&G Financial Corporation ("the Company") (NYSE: RGF), the
> financial holding company of R-G Premier Bank, one of the fastest
> growing commercial banks in Puerto Rico, R-G Crown Bank, its
> federal savings bank with branches in the Orlando and Tampa/St.
> Petersburg Florida markets, and R&G Mortgage Corp, the second
> largest residential mortgage loan originator and servicer in Puerto
> Rico, today reported record earnings for the second quarter and
> first half of 2003.
>
> For the first six months of 2003, net income amounted to $60.6
> million, compared to $44.2 million 2002, an improvement of 37%.
> For the second quarter of 2003, net income amounted to $31.4
> million compared to $22.6 million for the second quarter of 2002,
> an increase of 39%. For the six months of 2003, consolidated
> earnings per diluted share were $1.54, compared to $1.17 for 2002,
> an increase of 32%; for the second quarter of 2003, consolidated
> earnings per diluted share were $0.80, compared to $0.59 per
> diluted share for the second quarter of 2002, an increase of 36%.
>
> These strong earning results were achieved notwithstanding
> impairment charges of $27.5 million and $16.7 million (included
> in operating expenses) during the first half and second quarter of
> 2003, respectively, on the Company's servicing asset. These
> charges reflect additional increases in mortgage prepayment rates
> during the period as a result of the continued low levels of interest
> rates. The resulting decrease in earnings was more than offset by
> increases in gain on sale and fees from mortgage loans, which were
> attributable to record volumes of mortgage loan originations and
> sales. Total loan production during the first half of 2003 was $2.1
> billion, a 61% increase over the first half in 2002; total loan
> production during the second quarter of 2003 was $1.1 billion, a
> 49% increase. In both periods, over 90% of the total loan
> production was internally generated. Total loan production during
> the second quarter was the highest amount for any given quarter in
> the Company's history, surpassing the amount for the first quarter
> this year.
>
> For the second quarter of 2003, gain on the origination and sale of
> loans increased 184% to $44.8 million, while the Company's net
> interest income increased by 24% to $44.6 million. For the first
> half of 2003, gain on the origination and sale of loans increased

133% to $77.8 million, while the Company's net interest income
increased by 28% to $86.8 million.

Other fee income for the first half of 2003 was $12.9 million,
representing a 63% increase over the comparative period in 2002.
The increase reflects the added contributions made by the
Company's insurance agency and its broker-dealer subsidiary.

Commenting on the significant results for the second quarter and
first half of 2003, Mr. Victor J. Galan, Chairman of the Board and
CEO of the Company indicated:

"We are pleased to report these excellent results during the quarter
ended June 30, 2003. The increase in earnings reflects another
strong quarter of loan production, surpassing the $1 billion mark
for the second consecutive quarter. Our loan portfolio has grown
by close to $250 million during the first half of 2003, due to strong
loan demand both in Puerto Rico and Central Florida, which
position R&G very well for the future. As a result of these strong
results, together with the continuing strong demand we are
experiencing both in commercial and residential lending, we
remain optimistic about our future performance."

18.    On August 14, 2003, R&G Financial filed its quarterly report with the SEC on

Form 10-Q. The Company's Form 10-Q, which reaffirmed the Company's previously

announced financial results, was signed and certified pursuant to sections 302 and 904 of the

Sarbanes-Oxley Act of 2002 by Defendants Galan and Sandoval.  Additionally, the defendants

represented the following:

The accompanying unaudited consolidated financial statements
have been prepared in accordance with the instructions for Form
10-Q.  Accordingly, they do not include all of the information and
footnotes required by generally accepted accounting principles.
However, in the opinion of management, the accompanying
unaudited consolidated financial statements include all adjustments
(principally consisting of normal recurring accruals) necessary for
a fair presentation of the Company's financial condition as of June
30, 2003 and the results of operations and changes in its cash flows
for the three and six months ended June 30, 2003 and 2002.

19.     On October 14, 2003, R&G issued a press release with the headline "R&G

Financial Reports Record Earnings for Third Quarter and Nine Months Ended September 30,

2003." Therein, the Company stated:

> R&G Financial Corporation (NYSE: RGF), ("the Company") the
> financial holding company of R-G Premier Bank, R-G Crown
> Bank and R&G Mortgage Corp, today reported record earnings for
> the third quarter and first nine months of 2003. For the first nine
> months of 2003, net income amounted to $94.9 million, compared
> to $69.2 million in 2002, an improvement of 37%. For the third
> quarter of 2003, net income amounted to $34.3 million compared
> to $25.0 million for the third quarter of 2002, an increase of 37%.
>
> For the nine months of 2003, consolidated earnings per diluted
> share were $2.43, compared to $1.81 for 2002, an increase of 34%;
> for the third quarter of 2003, consolidated earnings per diluted
> share were $0.89, compared to $0.63 per diluted share for the third
> quarter of 2002, an increase of 41%.
>
> The Company's return on equity during the third quarter of 2003
> was 24.26%, while its return on assets was 1.82%. The efficiency
> ratio for the quarter was 49%.
>
> For the third quarter of 2003, gain on the origination and sale of
> loans increased 24% to $30.2 million, while the Company's net
> interest income increased by 16% to $47.7 million. For the first
> nine months of 2003, gain on the origination and sale of loans
> increased 87% to $108.0 million, while the Company's net interest
> income increased by 23% to $134.5 million.
>
> Other fee income for the first nine months of 2003 was $20.9
> million, representing a 68% increase over the comparative period
> in 2002. The increase reflects the added contributions made by the
> Company's insurance and broker- dealer subsidiaries.
>
> The increase in earnings during the third quarter of 2003 also
> reflects a significant decrease in servicing-related impairment
> charges. Impairment charges of the Company's servicing asset
> were $32.1 million and $4.6 million (included in operating
> expenses) during the first nine months and third quarter of 2003,
> respectively, compared to $13.7 million and $10.7 million during
> the first nine months and third quarter of 2002, respectively. The
> lower charges during the quarter reflect lower mortgage
> prepayment rates as a result of a recent increase in interest rates for
> mortgage loans. In spite of the increase in rates during the quarter,

loan production remained strong. Total loan production during the
third quarter of 2003 was $1.3 billion, a 69% increase over the
same period in 2002; total loan production during the first nine
months of 2003 was $3.4 billion, a 64% increase. Total loan
production during the third quarter was the highest amount for any
given quarter in the Company's history, surpassing the amount for
the first and second quarters this year.

Total assets of R-G Crown Bank at the end of the third quarter
were $1.1 billion; total banking assets were $7.0 billion.

Commenting on the record results for the third quarter and first
nine months of 2003, Mr. Victor J. Galan, Chairman of the Board
and CEO of the Company indicated:

"We are pleased to report these excellent results during the quarter
ended September 30, 2003. During the quarter, the Company
achieved an exceptional quarter of loan production, reaching $1.3
billion, the highest in the Company's history. A significant amount
of these loans were added to the Company's loans portfolio,
growing to about $3.8 billion as of the end of the third quarter, or a
$1 billion increase since the beginning of the year. While a
decrease in the volume of mortgage loan refinancings is expected
in the future due to higher interest rates, the impact should not be
substantial to the overall financial performance of the Company
due to the continued strength in the Puerto Rico and Central
Florida lending markets. Growth in the Company's banking and
mortgage banking sectors should continue through ongoing
expansion in commercial and residential lending, which leads us to
remain optimistic about our future performance."

20.     On November 14, 2003, R&G Financial filed its quarterly report with the SEC on

Form 10-Q. The Company's Form 10-Q, which reaffirmed the Company's previously

announced financial results, was signed and certified pursuant to sections 302 and 904 of the

Sarbanes-Oxley Act of 2002 by Defendants Galan and Sandoval. Additionally, the defendants

represented the following:

The accompanying unaudited consolidated financial statements
have been prepared in accordance with the instructions for Form
10-Q. Accordingly, they do not include all of the information and
footnotes required by generally accepted accounting principles.
However, in the opinion of management, the accompanying
unaudited consolidated financial statements include all adjustments

(principally consisting of normal recurring accruals) necessary for
a fair presentation of the Company's financial condition as of
September 20, 2003 and the results of operations and changes in its
cash flows for the three and nine months ended September 30,
2003 and 2002.

21.     On January 20, 2004, R&G Financial issued a press release with the headline

"R&G Financial Reports Record Earnings for Fourth Quarter and Year Ended December 31,

2003." Therein, the Company stated:

> R&G Financial Corporation (NYSE: RGF) ("the Company"), the
> financial holding company of R-G Premier Bank, R-G Crown
> Bank and R&G Mortgage Corp., today reported record earnings
> for the fourth quarter and year ended December 31, 2003. For the
> year ended December 31, 2003, net income amounted to $131.0
> million, compared to $96.3 million in 2002, an improvement of
> 36%. For the fourth quarter of 2003, net income amounted to $36.1
> million compared to $27.1 million for the fourth quarter of 2002,
> an increase of 33%.
>
> For the year ended December 31, 2003, consolidated earnings per
> diluted share were $3.37, compared to $2.49 for 2002, an increase
> of 35%; for the fourth quarter of 2003, consolidated earnings per
> diluted share were $0.94, compared to $0.68 per diluted share for
> the fourth quarter of 2002, an increase of 38%.
>
> The Company's return on equity during the fourth quarter of 2003
> was 24.52%, while its return on assets was 1.80%.
>
> For the fourth quarter of 2003, gain on the origination and sale of
> loans increased 41% to $38.9 million, while the Company's net
> interest income increased by 22% to $53.4 million. For the year
> ended December 31, 2003, gain on the origination and sale of
> loans increased 72% to $146.9 million, while the Company's net
> interest income increased by 23% to $188.0 million.
>
> The increase in earnings during the fourth quarter of 2003 also
> reflects a significant decrease in servicing-related impairment
> charges. Impairment charges (included in operating expenses) of
> the Company's servicing asset for the fourth quarter and year
> ended December 31, 2003, were $5.6 million and $37.7 million,
> respectively, compared to $7.3 million and $21.0 million during
> the 2002 respective periods. The lower charges during the quarter
> reflect lower mortgage prepayment rates as a result of recent
> increases in interest rates for mortgage loans. In spite of the

increase in rates during the quarter, loan production remained strong. Total loan production during the fourth quarter of 2003 was $1.1 billion, a 23% increase over the same period in 2002; total loan production during the year ended December 31, 2003, was $4.5 billion, a 52% increase, driven principally by the Company's ongoing expansion in commercial and residential lending in Central Florida and Puerto Rico, as well as increased refinancings during the year in its mortgage banking segment due to low interest rates.

Total assets of R-G Crown Bank at the end of the fourth quarter were $1.3 billion, increasing 56.4% during the year. Total banking assets increased 34.6% during the year to $7.4 billion, which represented 90.3% of the Company's consolidated assets at December 31, 2003.

Commenting on the record results for the fourth quarter and year ended December 31, 2003, Mr. Victor J. Galan, Chairman of the Board and CEO of the Company indicated: "We are very pleased to report these excellent results during the quarter and year ended December 31, 2003. During the quarter, the Company continued to successfully expand its loan portfolio, which is attributable both to general market growth coupled with the Company's ongoing penetration in residential and commercial lending in Central Florida and Puerto Rico. The loan portfolio grew to a record $4.0 billion, or a 47% increase from the prior year-end, which positions the Company very well for its future performance. As a result, during the fourth quarter of 2003, the Company's net interest income alone grew an impressive 12% on a linked quarter basis (48% on an annual basis). We continue to believe that the impact of any decrease in the volume of mortgage loan refinancings that could occur in the future due to higher interest rates should not be significant to the overall financial performance of the Company due to the Company's ongoing expansion and the continued strength in Central Florida's lending markets and Puerto Rico's new construction sector. 2004 should be another strong year for R&G, with continued growth and greater profitability."

22.    On March 15, 2004, R&G Financial filed its annual report with the SEC on Form 10-K. The Company's Form 10-K was signed by the Individual Defendants and reaffirmed the Company's previously announced financial results. Additionally, the Company's Form 10-K contained the following clean audit opinion of PricewaterhouseCoopers, LLP:

14

> In our opinion, the accompanying consolidated statements of
> financial condition and the related consolidated statements of
> income, of comprehensive income, of changes in stockholders'
> equity, and of cash flows present fairly, in all material respects, the
> financial position of R&G Financial Corporation (the Company)
> and its subsidiaries of December 31, 2003 and 2002, and the
> results of their operations and their cash flows for each of the three
> years in the period ended December 31, 2003 in conformity with
> accounting principles generally accepted in the United States of
> America. These financial statements are the responsibility of the
> Company's management; our responsibility is to express an
> opinion on these financial statements based on our audits. We
> conducted our audits of these statements in accordance with
> auditing standards generally accepted in the United States of
> America, which require that we plan and perform the audit to
> obtain reasonable assurance about whether the financial statements
> are free of material misstatement. An audit includes examining, on
> a test basis, evidence supporting the amounts and disclosures in the
> financial statements, assessing the accounting principles used and
> significant estimates made by management, and evaluating the
> overall financial statement presentation. We believe that our audits
> provide a reasonable basis for our opinion.

23.     On April 19, 2004, R&G Financial issued a press release with the headline "R&G

Financial Reports Record Earnings for First Quarter Ended March 31, 2004." Therein, the

Company stated:

> R&G Financial Corporation ("the Company") (NYSE: RGF), the
> financial holding company of R-G Premier Bank, R-G Crown
> Bank and R&G Mortgage Corp., today reported record earnings
> for the first quarter ended March 31, 2004. For the first quarter of
> 2004, net income amounted to $38.5 million, compared to $29.1
> million for the first quarter in 2003, an increase of 32%.
>
> For the first quarter of 2004, consolidated earnings per diluted
> share were $0.67, compared to $0.49 for the first quarter of 2003,
> an increase of 37%.
>
> The Company's return on equity during the first quarter of 2004
> was 24.98%, while its return on assets was 1.84%, compared to
> 21.94% and 1.77%, respectively, during the first quarter of 2003.
>
> For the first quarter of 2004, the Company's net interest income
> increased by 32% to $55.7 million, due to an increase in earnings

assets during the period, while gain on the origination and sale of loans increased 21% to $39.9 million.

The increase in earnings during the first quarter of 2004 also reflects a reduction in servicing related impairment charges. Impairment charges (included in operating expenses) of the Company's servicing asset for the first quarter of 2004 were $9.3 million, compared to $10.8 million during the first quarter of 2003. Management believes that a portion of the impairment charges recorded during the first quarter will reverse during the second quarter this year, based on the current interest rate environment and the refinancing rate for mortgage loans.

Results for the quarter ended March 31, 2004 were also adversely affected by a $1.1 million charge to income taxes, related to the non-realization of certain tax benefits recorded in prior years for amounts expected to reverse at rates lower than the Company's statutory tax rate.

Loan production remained strong. Total loan production during the first quarter of 2004 was $930 million, a 9% decrease compared to the same period in 2003, principally as a result of decreased refinancings from its U.S. mortgage lending division. During the first quarter of 2003, refinancings for the Company were at a record level. The Company loan production continues to be driven principally by the Company's ongoing expansion in commercial and residential lending in Central Florida and Puerto Rico, as well as refinancings during the period in its mortgage banking segment in Puerto Rico consistent with R-G Financial's historical experience.

Total assets of R-G Crown Bank at the end of the first quarter of 2004 were $1.3 billion, contributing $5.9 million in profits during the quarter. Total banking assets increased 23% compared to the first quarter of 2003 to $7.5 billion, which represented 87.5% of the Company's consolidated assets at March 31, 2004.

Non-performing loans increased $13.1 million as of March 31, 2004 compared to December 31, 2003. The increase is mostly related to an increase in R&G Financial Corporation non-performing residential mortgage loans in the process of foreclosure. The Company's loss experience in this type of loans continues to be minimal. Notwithstanding, the Company increased its provision for loan losses during the first quarter of 2003 by $2.25 million due to continued increases of the Company's commercial (including construction) loan portfolio.

Commenting on the record results for the first quarter of 2004, Mr. Victor J. Galan, Chairman of the Board and CEO of the Company, indicated:

"We continue to believe that the possible impact of a decrease in the volume of mortgage loan refinancings that could occur in the future due to higher interest rates should not be significant to the overall financial performance of the Company, due to the continued strength in Central Florida's lending markets and Puerto Rico's new housing sector, and the continued expansion of our banking franchise in Puerto Rico. We remain very positive about the Company's future prospects and the year 2004, which we continue to believe should be another strong year for R&G, with continued growth and greater profitability."

24.     On May 10, 2004, R&GFinancial filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by the Individual Defendants and reaffirmed the Company's previously announced financial results.  Additionally, the defendants represented the following:

The accompanying unaudited consolidated financial statements have been prepared in accordance with the instructions for Form 10-Q.  Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles. However, in the opinion of management, the accompanying unaudited consolidated financial statements include all adjustments (principally consisting of normal recurring accruals) necessary for a fair presentation of the Company's financial condition as of March 31, 2004 and the results of operations and changes in its cash flows for the three months ended March 31, 2004 and 2003.

25.     On July 19, 2004, R&G issued a press release with the headline "R&G Financial Reports Record Earnings for Second Quarter and Six Months Ended June 30, 2004." Therein the Company stated:

R&G Financial Corporation (the "Company") (NYSE: RGF), the financial holding company of R-G Premier Bank, R-G Crown Bank, and R&G Mortgage Corp, today reported record earnings for the second quarter and first half of 2004.

For the first six months of 2004, net income amounted to $79.3 million, compared to $60.6 million in 2003, an improvement of

17

31%. For the second quarter of 2004, net income amounted to $40.7 million compared to $31.4 million for the second quarter of 2003, an increase of 30%. For the six months of 2004, consolidated earnings per diluted share were $1.39, compared to $1.03 for 2003, an increase of 35%; for the second quarter of 2004, consolidated earnings per diluted share were $0.72, compared to $0.54 per diluted share for the second quarter of 2003, an increase of 33%.

The Company's return on equity during the second quarter of 2004 was 25.89%, while its return on assets was 1.86%, compared to 22.99% and 1.78%, respectively, during the second quarter of 2003.

For the second quarter of 2004, the Company's net interest income increased 26% to $56.0 million, due primarily to an increase in earning assets during the period, while gain on the origination and sale of loans decreased 8% to $41.4 million. While the Company's loan production during the 2004 quarter increased 4% to $1.1 billion compared to 2003, the Company retained an increasing amount of its total production in its loan portfolio, in an effort to continue growing its future net interest income by expanding the volume of loans. For the first half of 2004, the Company's net interest income increased by 29% to $111.7 million, while gain on the origination and sale of loans increased 4% to $81.3 million.

Total loan production during the first half of 2004 was $2.1 billion; total loan production during the second quarter was $1.1 billion, surpassing the amount for the first quarter this year. In both periods, over 90% of the Company's total loan production continues to be internally generated. The increase in earnings during the first half and second quarter of 2004 also reflects a reduction in servicing related impairment charges (included in operating expenses) of $21.6 million and $20.1 million, respectively. These reductions stem from decreases in mortgage prepayment rates in the Company's loan servicing portfolio during the period.

Total assets of R-G Crown Bank at the end of the second quarter of 2004 were $1.5 billion, contributing $11.0 million in profits during the first half of 2004. Total banking assets increased 26% compared to the second quarter of 2003 to $8.2 billion, which represented 91% of the Company's consolidated assets at June 30, 2004.

Commenting on the significant results for the second quarter and first half of 2004, Mr. Victor J. Galan, Chairman of the Board and CEO of the Company indicated:

"We are pleased to report these excellent results during the quarter
ended June 30, 2004. The increase in earnings reflects another
strong quarter of loan production, as we continue to benefit from
strong loan demand both in Puerto Rico and Central Florida. Our
loan portfolio has grown over $450 million during the first half of
2004, which continues to position R&G very well for the future.
As a result of these strong results, together with the continuing
strong demand we are experiencing both in commercial and
residential lending, we remain optimistic about our future
performance."

26.     On August 9, 2004, R&G filed its quarterly report with the SEC on Form 10-Q.

The Company's Form 10-Q was signed by the Individual Defendants and reaffirmed the

Company's previously announced financial results.  Additionally, the defendants represented the

following:

The accompanying unaudited consolidated financial statements
have been prepared in accordance with the instructions for Form
10-Q.  Accordingly, they do not include all of the information and
footnotes required by generally accepted accounting principles.
However, in the opinion of management, the accompanying
unaudited consolidated financial statements include all adjustments
(principally consisting of normal recurring accruals) necessary for
a fair presentation of the Company's financial condition as of June
30, 2004 and the results of operations and changes in its cash flows
for the three months ended June 30, 2004 and 2003.

27.     On October 22, 2004, R&G issued a press release with the headline "R&G

Financial Reports Record Earnings for Third Quarter and Nine Months Ended September 30,

2004."  Therein, the Company stated:

R&G Financial Corporation (NYSE: RGF) (the "Company"), the
financial holding company of R-G Premier Bank, R-G Crown
Bank and R&G Mortgage Corp, today reported record earnings for
the third quarter and first nine months of 2004.

For the first nine months of 2004, net income amounted to $120.2
million, compared to $94.9 million in 2003, an improvement of
27%. For the third quarter of 2004, net income amounted to $40.9
million, compared to $34.3 million for the third quarter of 2003, an
increase of 19%. For the nine months of 2004, consolidated
earnings per diluted share were $2.11, compared to $1.62 for 2003,

19

an increase of 30%. For the third quarter of 2004, consolidated earnings per diluted share were $0.72, compared to $0.59 per diluted share for the third quarter of 2003, an increase of 22%.

These excellent results were achieved notwithstanding trading losses of $25.0 million and $24.0 million during the nine months and quarter ended September 30, 2004, respectively, on derivative instruments held by the Company, including certain derivatives held for risk management purposes.

The Company's return on equity during the third quarter of 2004 was 25.08%, while its return on assets was 1.81%, compared to 24.26% and 1.82%, respectively, during the third quarter of 2003.

For the third quarter of 2004, the Company's net interest income increased 29% to $61.4 million, due primarily to an increase in earning assets during the period, while gain on sale of loans increased 85% to $54.5 million. For the first nine months of 2004, the Company's net interest income increased by 29% to $173.1 million, while gain on sale of loans increased 27% to $136.9 million.

Total loan production during the first nine months of 2004 was $3.4 billion. Total loan production during the third quarter was $1.3 billion, surpassing the amount for the second quarter this year. In both periods, almost 90% of the Company's total loan production continues to be internally generated.

The increase in earnings during the first nine months and third quarter of 2004 also reflects a reduction in servicing-related impairment charges (including in operating expenses) of $709,000 and $22.3 million, respectively. These reductions stem from decreases in mortgages prepayment rates in the Company's loan servicing portfolio during the periods.

Total assets of R-G Crown Bank at the end of the third quarter of 2004 were $1.6 billion, contributing $18.3 million in profits during the first nine months of 2004. Total banking assets increased 21%, compared to the third quarter of 2003 to $8.5 billion, which represented 92% of the Company's consolidated assets at September 30, 2004.

Commenting on the significant results for the third quarter and first nine months of 2004, Mr. Victor J. Galan, Chairman of the Board and CEO of the Company, indicated:

"The increase in earnings reflects another strong quarter of loan production as we continue to benefit from strong loan demand both

in Puerto Rico and Central Florida, which continues to position R&G very well for the future. As a result of these strong results, together with the continuing strong demand we are experiencing both in commercial and residential lending, we remain optimistic about our future performance."

28.    On November 15, 2004, R&G issued a press release with the headline "R&G

Financial Corporation Revises Previously Announced Earnings For September 30, 2004

Quarter." Therein, the Company stated:

> R&G Financial Corporation (NYSE: RGF), the financial holding company of R-G Premier Bank, R- G Crown Bank, and R&G Mortgage Corp, today announced that in connection with the filing of its third quarter Form 10-Q, it has revised its earnings for the quarter and nine months ended September 30, 2004 from what was previously announced in its third quarter earnings press release issued on October 22, 2004. As a result of the accounting changes described herein, the Company's consolidated income for the quarter and nine months ended September 30, 2004 will decrease by approximately $3.9 million or $0.08 per diluted share for the third quarter of 2004 and $0.09 per diluted share for the nine months ended September 30, 2004, to $37.0 million and $116.3 million, or $0.64 and $2.03 per diluted share, respectively. For the quarter and nine months ended September 30, 2004, the Company previously indicated in its earnings release net income of $40.9 million and $120.2 million, or $0.72 and $2.12 per diluted share, respectively.

> The Company previously reported in its earnings release that it had incurred trading losses of $24.0 million during the three months ended September 30, 2004, on derivative instruments held by the Company, including derivatives held for interest-rate risk management purposes. Specifically, during the quarter ended September 30, 2004, the Company determined that it was appropriate to report losses related to some of its retained beneficial interests resulting from past and ongoing financial asset transfers accounted for as sales as trading derivatives in accordance with SFAS No. 133, Accounting for Derivative Instruments and Hedging Activities. Pursuant to SFAS No. 133, such instruments are marked-to-market quarterly, with unrealized gains and losses recorded in the Company's consolidated statements of income. Prior to the September 2004 quarter, the Company had reported all of such retained beneficial interests at fair value as interest-only strips and classified them as available for sale securities, with unrealized marked-to- market gains or losses

recorded in other comprehensive income in the Company's
consolidated financial statements. As a result of the application of
SFAS 133 to such transactions, the Company in its earnings
release included a $14.0 million trading loss on certain of such
retained residual interests during the quarter ended September 30,
2004. The Company also previously reported a $10.0 million loss
related to a decrease in the fair value hedge the Company had
acquired for interest-rate risk management purposes, which lost
value due to the flat yield curve environment in the quarter.

When the Company delayed the filing of its Form 10-Q for the
September 2004 quarter, it disclosed that it was reviewing certain
information regarding past sale transactions to determine whether
the application of SFAS 133 to its residual interests is appropriate
to events that occurred during the second and/or third quarter of
2004. The Company has concluded that it is appropriate to reduce
by $2.5 million its trading loss related to its residual interests
classified as trading derivates, for aggregate trading losses of $21.5
million. In addition, the Company has determined that certain
interest- only strips that are classified as available for sale
securities were impaired. As such, the Company has recorded a
permanent impairment charge of $8.8 million in accordance with
EITF 99-20, Recognition of Interest Income and Impairment on
Purchased and Retained Beneficial Interests in Securitized
Financial Assets, which is the primary reason for the change to
previously released earnings information.

29.     Also on November 15, 2004, R&G filed its quarterly report with the SEC on

Form 10-Q. The Company's Form 10-Q was signed by the Individual Defendants and

reaffirmed the Company's previously announced financial results. Additionally, the defendants

represented the following:

The accompanying unaudited consolidated financial statements
have been prepared in accordance with the instructions for Form
10-Q. Accordingly, they do not include all of the information and
footnotes required by generally accepted accounting principles.
However, in the opinion of management, the accompanying
unaudited consolidated financial statements include all adjustments
(principally consisting of normal recurring accruals) necessary for
a fair presentation of the Company's financial condition as of
September 30, 2004 and the results of operations and changes in its
cash flows for the three months ended September 30, 2004 and
2003.

30.    On January 24, 2005, R&G issued a press release with the headline "R&G

Financial Reports Record Earnings for Fourth Quarter and Year Ended December 31, 2004."

Therein, the Company stated:

> R&G Financial Corporation (NYSE: RGF) (the "Company"), the
> financial holding company of R-G Premier Bank, R-G Crown
> Bank and R&G Mortgage Corp, today reported record earnings for
> the fourth quarter and year ended December 31, 2004.
>
> For the year ended December 31, 2004, net income amounted to
> $160.2 million, compared to $131.0 million in 2003, an
> improvement of 22%. For the fourth quarter of 2004, net income
> amounted to $43.9 million compared to $36.1 million for the
> fourth quarter of 2003, an increase of 22%. For the year ended
> December 31, 2004, consolidated earnings per diluted share were
> $2.81, compared to $2.25 for 2003, an increase of 25%; for the
> fourth quarter of 2004, consolidated earnings per diluted share
> were $0.78, compared to $0.63 per diluted share for the fourth
> quarter of 2003, an increase of 24%.
>
> These excellent results for the year ended December 31, 2004,
> were achieved notwithstanding previously reported trading losses
> of $18.9 million during the year on derivative instruments held by
> the Company, including certain derivatives held for risk
> management purposes.
>
> The Company's return on equity during the year ended December
> 31, 2004, and the fourth quarter of 2004, was 24.64% and 25.46%,
> while its return on assets was 1.78% and 1.81%, compared to a
> return on equity of 23.45% and 24.52% and a return of assets of
> 1.80% and 1.80% during the year ended December 31, 2003, and
> the fourth quarter of 2003.
>
> For the year ended December 31, 2004, the Company's net interest
> income increased by 23% to $230.9 million, due primarily to an
> increase in earning assets during the period, while gain on sale of
> loans increased 19% to $175.5 million. For the fourth quarter of
> 2004, the Company's net interest income increased 8% to $57.8
> million, while gain on sale of loans increased 27% to $49.6
> million.
>
> Total loan production during the year ended December 31, 2004
> was $4.8 billion; total loan production during the fourth quarter
> was $1.5 billion, surpassing the amount for the third quarter this
> year. In both the third and fourth quarter, these amounts represent

23

new all-time records for the Company. The amount of loan
production for the fourth quarter of 2004 increased 37% compared
to the corresponding period in 2003 in spite of higher interest rates
in the 2004 period.

The increase in earnings during the year ended December 31, 2004
also reflects a reduction in servicing related impairment charges
(included in operating expenses) of $23.6 million. The reduction
stems from decreases in mortgage prepayment rates in the
Company's loan servicing portfolio during 2004.

Total assets of R-G Crown Bank increased 46% during the year
2004 to $1.9 billion, contributing $14.7 million in profits during
2004. Total banking assets of the Company increased 27% during
2004 to $9.4 billion, representing 92% of consolidated assets at
December 31, 2004.

Commenting on the significant results for the fourth quarter and
year ended December 31, 2004, Mr. Victor J. Galan, Chairman of
the Board and CEO of the Company, indicated: "We are pleased to
report another strong quarter of earning and loans production. We
ended 2004 with record assets of $10.2 billion, resulting from
continued strong demand in residential and commercial lending
both in Puerto Rico and Central Florida, as evidenced by our $1.5
billion record loan production during the fourth quarter of 2004.
One month from now, we expect to close the transaction with
Wachovia Corporation in which we will obtain 18 additional
branches in the states of Florida and Georgia. This transaction will
strengthen our presence in Central Florida and expand our territory
into very important markets for R&G in the future, as we continue
our expansion in the Continental United States. Coupled with
continued strong loan demand in Puerto Rico, as well as other
initiatives, we anticipate strong loan production through 2005 and
remain optimistic about our future performance."

31.      On March 16, 2005, R&G filed its annual report with the SEC on Form 10-K.

The Company's Form 10-K was signed by the Individual Defendants and reaffirmed the

Company's previously announced financial results.  Additionally, the Company's Form 10-K

contained the following clean audit opinion of PricewaterhouseCoopers, LLP:

Consolidated financial statements

In our opinion, the consolidated statements of financial condition
and the related consolidated statements of income, of

24

comprehensive income, of changes in stockholders' equity and of cash flows present fairly, in all material respects, the financial position of R&G Financial Corporation and its subsidiaries at December 31, 2040 and 2003, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2004 in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit of financial statements includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

Internal Control over financial reporting

Also, in our opinion, management's assessment, included in Management's Report on Internal Control Over Financial Reporting appearing on page 32 of the 2004 Annual Report to Shareholders that the Company maintained effective internal control over financial reporting as of December 31, 2004 based on criteria established in "Internal Control – Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), is fairly stated, in all material respects, based on those criteria. Further more, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2004, based on criteria established in "Internal Control – Integrated Framework" issued by COSO. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express opinions on management's assessment and on the effectiveness of the Company's internal control over financial reporting based on our audit. We conducted our audit of internal control over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (United STtes). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial

> reporting was maintained in all material respects  An audit of
> internal control over financial reporting includes obtaining an
> understanding of internal control over financial reporting,
> evaluating management's assessment, testing and evaluating the
> design and operating effectiveness of internal control, and
> performing such other procedures as we consider necessary in the
> circumstances.  We believe that our audit provides a reasonable
> basis for our opinions.

32.     The statements contained in ¶¶15-31 were materially false and misleading when

made because defendants failed to disclose or indicate the following:  (1) that R&G Financial's

earnings quality had been significantly weakened by the Company's use of more aggressive

assumptions to generate gain on sale income, as well as to the value it retained in its interest only

("IO") residuals in securitization transactions; (2) that R&G Financial's methodology used to

calculate the fair value of its IO residual interests retained in securitization transactions was

incorrect and caused the Company to overstate its financial results by at least $50 million; (3)

that the Company's financial statements were not prepared in accordance with Generally

Accepted Accounting Principles ("GAAP"); (4) that the Company lacked adequate internal

controls and was therefore unable to ascertain the true financial condition of the Company; and

(5) that as a result, the value of the Company's net income and financial results were materially

overstated at all relevant times.

**B.     The Truth Emerges**

33.     On April 25, 2005, after the market had closed, R&G announced that it would

restate its financial results of fiscal years 2003 and 2004.  More specifically, the Company stated:

> R&G Financial Corporation (NYSE: <u>RGF</u>) ("R&G Financial")
> announced today that after consultation with its independent
> accountants and firms with experience in valuation issues, the
> Company has determined to review the independent market
> valuations used in valuing residual interests retained in
> securitization transactions of the Company. The Company stated
> that it is revising its valuation methodology used in valuing these
> interests that are presented in the Company's audited consolidated

financial statements. The Company reached this determination after discussions with its independent accountants, which the Company initiated on Tuesday, April 19th and culminated on Friday, April 22nd.

As of December 31, 2004, the Company had reported in its recently-issued audited consolidated financial statements an aggregate of $190 million of residual interests retained. Under the methodology used to prepare the audited consolidated financial statements, the Company had taken impairment charges on its residual interests amounting to $20.3 million and $11.90 million during the third and fourth quarters of 2004, respectively. An additional impairment charge for the first quarter of 2005 of $30.1 million had been estimated by the Company under the methodology it had been using. The Company is considering alternative valuation methodologies. Depending on the valuation methodology used, the Company has preliminarily estimated that the fair value of its residual interests would be reduced as of December 31, 2004 by an amount equal to between approximately $90 million to $150 million ($55 million and $90 million after taxes, respectively). Any such reduction would be a non-cash charge to the Company's consolidated statement of operations. The Company has not yet determined how such net impact will be distributed among the affected periods.

The Company has concluded that previously filed interim and audited financial statements for the periods from January 1, 2003 through December 31, 2004, would be materially affected as a result of the revision in the valuation methodologies being contemplated, and therefore, the financial statements for the periods included therein should be restated. The Company's independent accountants have not yet performed audit procedures on any revised estimates.

As a result of these events, the Company will delay the release of its earnings for the first quarter of 2005. The Company intends to release its unaudited earnings for the first quarter of 2005 and the restated results for prior periods as soon as practicable. As part of this process, the Company will be reviewing the management report on internal control over financial reporting for 2004. The Company has also retained Sullivan & Cromwell LLP as its special counsel to advise the Company on legal issues arising from the valuation of its residual interests retained on securitization transactions.

Assuming a reduction in the value of its residual interests of $150 million, the Company will remain a well-capitalized institution in

accordance with federal banking regulatory standards, with a
leverage ratio as of December 31, 2004 of approximately 10.44%,
compared to the previously reported 11.29%. Its banking
subsidiaries are also expected to remain well- capitalized.

34.     News of this shocked the market and shares of R&G, fell $8.14 per share, or

35.12 percent, to close at $15.04 on April 26, 2005.  Trading volume was unusually heavy.

35.     After the market closed on April 26, 2005, R&G issued a press release

announcing that it was the subject of an informal SEC probe relating to the announcement made

on April 25, 2005.  Analysts from Piper Jaffray and Keefe Bruyette immediately downgraded the

Company.

## R&G'S FALSE FINANCIAL REPORTING DURING THE CLASS PERIOD

36.     In order to overstate the Company's financial results during the Class Period, the

defendants caused the Company to misreport its investment in interest-only securities, mortgages

servicing rights and adjustable-rate mortgages.  Defendants overstated R&G's assets by failing to

recognize impairment of these assets caused by adverse interest-rate increases (increases which

the Company falsely represented would not adversely affect its results).  Defendants thereby

overstated the Company's financial statements during the Class Period.   As a result of R&G's

improper accounting for its portfolio, R&G presented materially false financial results during the

Class Period in violation of GAAP despite the fact that defendants repeatedly represented that

the financials were prepared "in accordance with generally accepted accounting principles."

37.     In addition, the Forms 10-Q represented that with respect to the financial

statements included therein, such financial statements included all adjustments necessary "for a

fair presentation" of R&G's financial position, results of operations and cash flows.

38.     These statements were false and misleading as to the financial results released

during the Class Period as such financial information was not prepared in accordance with

28

GAAP, nor did the financial information "present fairly" the Company's operations due to the Company's improper accounting for its interest-only investments and mortgage-servicing rights which improper accounting caused the Company's earnings to be materially overstated in violation of GAAP and SEC rules.

39.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

40.     GAAP, as forth in FASB Statement of Concepts No. 5, ¶ 87 states:

> An expense or lose is recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated, or that a liability has been incurred or increased, without associated economic benefits.

41.     GAAP, as set forth in FASB Statement of Financial Accounting Standards ("SFAS") No. 115, <u>Accounting for Certain Investments in Debt and Equity Securities</u>, ¶16, states:

> For individual securities classified as either available-for-sale or held-to-maturity, an enterprise shall determine whether a decline in fair value below the amortized cost basis is other than temporary. For example, if it is probable that the investor will be unable to collect all amounts due according to the contractual terms of a debt security not impaired at acquisition, an other-than-temporary impairment shall be considered to have occurred. If the decline in fair value is judged to be other than temporary, the cost basis of the individual security shall be written down to fair value as a new cost

basis and the amount of the writedown shall be included in
earnings (that is, accounted for as a realized loss).[1]

42.     Due to the aforementioned accounting improprieties, the Company presented its

financial results and statements in a manner which violated GAAP.  Indeed, the falsity of R&G's

Class Period financial statements has now been admitted by defendants.  In a press release issued

on April 19, 2005, defendants admitted that:

> The Company has determined that it is appropriate to correct the methodology used to
> calculate the fair value of its portfolio of floating rate interest only strips ("IOs"). The
> Company's preliminary estimate is that this correction will result in a decrease in the fair
> value of its floating rate IOs of between $400 million to $600 million as of December 31,
> 2004. The required adjustment cannot be taken as a charge in current period earnings but
> instead will have to be reflected in those periods during which the origination of floating
> rate IOs had a material impact on the Company's financial statements. The after-tax effect
> of the required adjustments as of December 31, 2004 is estimated to range between $290
> million to $435 million. The Company has not yet determined how such net impact will
> be distributed among the affected periods.

43.     SEC Regulation S-X requires that publicly traded companies present their annual

financial statements in accordance with GAAP. [17 C.F.R. § 210.4-01(a) (1)].  In addition,

Regulation S-X requires that interim financial statements also comply with GAAP.  Financial

statements filed with the SEC that are not prepared in compliance with GAAP are presumed to

be misleading and inaccurate.  Management is responsible for preparing financial statements that

conform to GAAP.  As noted by AICPA professional standards:

> financial statements are management's responsibility…[M]anagement is
> responsible for adopting sound accounting policies and for establishing and
> maintaining internal control that will, among other things, record, process,
> summarize and report transactions (as well as events and conditions) consistent

---

[1]  According to SFAS No. 125, 14:

Interest-only strips, loans, other receivables, or retained interests in securitizations that can
contractually be prepaid or otherwise settled in such a way that the holder would not recover
substantially all of its recorded investment shall be subsequently measured like investments in
debt securities classified as available-for-sale or trading under Statement 115, as amended by this
Statement (paragraph 233).

with management's assertions embodied in the financial statements. The entity's transactions...are within the direct knowledge and control of management....Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

**A. Internal Control Deficiencies**

44.     The Company also suffered from a chronic and systematic breakdown of its internal accounting controls, which rendered R&G's financial reporting unreliable and incorrect, resulting in materially false and misleading financial statements.

45.     Section 13(b)(2)(B) of the Exchange Act requires every issuer that has securities registered pursuant to Section 12 of the Exchange Act, such as R&G to: (A) make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and disposition of the assets of the issuer; and (B) devise and maintain a system of internal accounting controls sufficient to reasonably assure, among other things, that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.  These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.

46.     R&G failed to implement and maintain an adequate internal control system, in a manner that would ensure compliance with GAAP, which Defendants knew or recklessly disregarded, resulting in materially false and misleading financial statements, despite the fact that R&G's CEO and CFO regularly signed certifications attesting to the adequacy of the Company's internal controls.

**B. R&G's False and Misleading Class Period Financial Statements Were Material**

47.    The foregoing violations of GAAP were material. Staff Accounting Bulletin No. 99 ("SAB 99), emphasizes the need to assess and take into account the qualitative aspects of materiality, including, but not limited to:

(a)    Whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate;

(b)    Whether the misstatement masks a change in earnings or other trends;

(c)    Whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise;

(d)    Whether the misstatement changes a loss into income or vice versa;

(e)    Whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability; and

(f)    Whether the misstatement has the effect of increasing management's compensation - for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation.

**C. Violations of SEC Regulations**

48.    Item 7 of Form 10-K and item 2 of Form 10-Q, Management discussions and Analysis of Financial Condition and Results of Operations ("MD&A" require the issuer to furnish information required by Item 303 of Regulation S-K [17.C.F.R.229.303]. In discussing results of operations, Item 303 of Regulation S-K requires the registrant to:

> [d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

49.     In addition, the SEC in its May 1989 Interpretive Release No. 34-26831, has

indicated that registrants should employ the following two step analysis in determining when a

known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item

303 of Regulation S-K:

> A disclosure duty exists where a trend, demand, event or uncertainty is both
> presently known to management and is reasonably likely to have a material effect
> on the registrant's financial condition or results of operations.

**D. Additional GAAP Violations**

50.     In addition to the accounting improprieties stated above, R&G presented its

financial statements during the Class Period in a manner which also violated at least the

following provisions of GAAP:

(a)     The concept that financial reporting should provide information that is

useful to present and potential investors and creditors and other users in making rational

investment, credit and similar decisions (Concepts Statement No. 1, ¶ 34);

(b)     The concept that financial reporting should provide information about the

economic resources of an enterprise, the claims to those resources, and the effects of

transactions, events and circumstances that change resources and claims to those resources

(Concepts Statement No. 1, ¶ 40);

(c)     The concept that financial reporting should provide information about how

management of an enterprise has discharged its stewardship responsibility to owners

(stockholders) for the use of enterprise resources entrusted to it.  To the extent that management

offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

accountability to prospective investors and to the public in general (Concepts Statement No. 1,

¶ 50);

(d)     The concept that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts  Statement No. 1, ¶ 42);

(e)     The concept that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶ 58-59);

(f)     The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶ 79); and

(g)     The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶ 95, 97).

## SCIENTER ALLEGATIONS

51.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding

R&G and its business practices, their control over and/or receipt of R&G's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning R&G, were active and culpable participants in the fraudulent scheme alleged herein. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

52.     The Individual Defendants engaged in such a scheme to inflate the price of R&G securities in order to: (i) protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby; (ii) enhance the value of their personal holdings of R&G securities; and(iii) reap enormous profits from the exercise of their stock options and the sale of R&G securities.

## STATUTORY SAFE HARBOR

53.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Further, none of the statements pleaded herein which were forward-looking statements were identified as "forward-looking statements" when made. Nor was it stated that actual results "could differ materially from those projected." Nor were the forward-looking statements pleaded accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein. Defendants are liable for the forward-looking statements pleaded because, at the time each of those forward-looking statements was made, the speaker knew the forward-looking statement

was false and the forward-looking statement was authorized and/or approved by an executive

officer of R&G who knew that those statements were false when made.   Further, the clear

language of the Private Securities Litigation Reform Act expressly excludes from the safe harbor

protection statements that are "included in a financial statement prepared in accordance with

generally accepted accounting principles." *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1339

(S.D. Fla. 1999); 15 U.S.C. §78u-5(b)(2)(A).

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

54.    Plaintiff will rely, in part, upon the presumption of reliance established by the

fraud-on-the-market doctrine in that, among other things:

a.    Defendants made public misrepresentations or failed to disclose facts

during the Class Period;

b.    The omissions and misrepresentations were material;

c.    R&G securities traded in an efficient market;

d.    The misrepresentations alleged would tend to induce a reasonable investor

to misjudge the value of the Company's securities; and

e.    Plaintiff and the other members of the Class purchased R&G securities

between the time Defendants misrepresented or failed to disclose material facts and the time the

true facts were disclosed, without knowledge of the misrepresented or omitted facts.

55.    At all relevant times, the market for R&G securities was an efficient market for

the following reasons, among others:

a.    R&G securities were listed and actively traded during the Class Period on

the NYSE, an open, highly efficient and automated market.

b.      As a regulated issuer, R&G regularly made public filings, including its Forms 10-K, Forms 10-Q and related press releases, with the SEC.

c.      R&G was followed by analysts from major brokerages including: Piper Jaffray, Keefe Bruyette, Friedman Billings, and UBS Warburg .

d.      The reports of these analysts were redistributed to the brokerages' sales force, their customers, and the public at large; and

e.      R&G regularly communicated with public investors via established market communication mechanisms, including the Company's website, regular disseminations of press releases on the major news wire services, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

56.     As a result, the market for R&G securities digested current information regarding the Company from the publicly available sources described above and reflected such information in the prices of R&G's securities.  As would be expected where a security is traded in an efficient market, material news concerning R&G's business had an immediate effect on the market price of R&G's securities, as evidenced by the rapid decline in the market price in the immediate aftermath of R&G's corrective disclosures as described herein.  Under these circumstances, all purchasers of R&G's securities during the Class Period suffered similar injury due to the fact that the price of R&G securities was artificially inflated throughout the Class Period.  At the times they purchased or otherwise acquired R&G's securities, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.  As a result, the presumption of reliance applies.  Plaintiff will also rely, in part, upon the presumption of reliance established by a material omission.

## COUNT I

## FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGAGED THEREUNDER AGAINST ALL DEFENDANTS.

57.    Plaintiff repeats the allegations set forth in paragraphs above as though fully set forth herein.  This claim is asserted against R&G and the Individual Defendants.

58.    During the Class Period, Defendants, carried out a plan, scheme and course of conduct which was intended to, and did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of R&G common stock; and (iii) cause Plaintiff and other members of the Class to purchase R&G stock at artificially inflated prices during the Class Period.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

59.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for R&G common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein, and as controlling persons of R&G, as alleged below.

60.    In addition to the duties of full disclosure imposed on Defendants as a result of their affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 *et seq.*) and S-K (17 C.F.R. §

229.10 *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly-traded securities would be based on truthful, complete and accurate information.

61.     Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of R&G as specified herein. These Defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of R&G's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about R&G and its business, operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of R&G securities during the Class Period.

62.     Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) Individual Defendants were all high-level executives and/or directors at the Company during the Class Period; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) the Individual Defendants enjoyed significant

personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) these Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

63.   Defendants had actual knowledge of the severe misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing R&G's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its stock. As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

64.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of R&G's common stock was artificially inflated during the Class Period. Unaware of the fact that the market price of R&G's shares was artificially inflated, and relying (directly or indirectly) on Defendants' false and misleading statements, or on the integrity of the market in which the securities are traded, and/or on the absence of material, adverse information known to or recklessly disregarded by Defendants (but not disclosed to the public) during the Class Period, Plaintiff and the other

members of the Class acquired R&G common stock during the Class Period at artificially high prices and were damaged thereby.

65.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were unaware of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and true value of R&G, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have acquired their R&G securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

66.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

67.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their acquisition of the Company's securities during the Class Period.

## COUNT II

## FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT

## AGAINST INDIVIDUAL DEFENDANTS

68.     Plaintiff repeats the allegations set forth above as if set forth fully herein.  This claim is asserted against the Individual Defendants.

69.     Individual Defendants were, and acted as, controlling persons of R&G within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, these Defendants had the requisite power to directly or indirectly control or influence the specific corporate policy which

resulted in the dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

70.     In addition, Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

71.     As set forth above, Individual Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, prays for judgment as follows:

a.     Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.     Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c.      Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs;

d.      Ordering an accounting of Defendants' insider trading proceeds;

e.      Awarding preliminary and permanent injunctive relief in favor of plaintiffs and the Class against Defendants, including an accounting and the imposition of a constructive trust and/or an asset freeze on Defendants' insider trading proceeds; and

f.      Such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: May _6_ , 2005

Respectfully submitted,

By: _____

John E. Mudd, Esq.
/S John E. Mudd
Bar Number 201102
**LAW OFFICES OF JOHN E. MUDD**
P.O.BOX 194134
San Juan, PR 00919-4134
(787)413-1673 TEL
(787)766-1596 FAX
E-mail:jemudd@yahoo.com

**Attorneys for Plaintiff**

**MILBERG WEISS BERSHAD &
SCHULMAN LLP**
Maya Saxena
Joseph E. White, III
Ariel Acevedo
Tower One, Suite 600
5200 Town Center Circle
Boca Raton, FL 33486
Tel: (561) 361-5000
Fax: (561) 367-8400

**Attorneys for Plaintiff**

s/ Glenn Carl James
Glenn Carl James
JAMES LAW OFFICE
PMB 501
1353 Rd. 19
Guaynabo, PR 00966-2700
Tel.(787)763-2888
Fax:(787)763-2881
E-mail: jameslawoffices@centennialpr.net

## PURSUANT TO FEDERAL SECURITIES LAWS

To:     Thomas J. McKenna, Esq.          Tel:    212-983-1300
        Gainey & McKenna                 Fax:    212-983-0383
        485 Fifth Avenue, 3rd Floor      Email: tjmckenna@gaineyandmckenna.com
        New York, New York 10017

I,  Jeffrey P. Jannett                         ("Plaintiff") declare the following as to the claims asserted under the federal securities laws that:

Plaintiff reviewed the draft complaint to be filed in this matter and authorized the filing.

Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

Plaintiff's transactions in the security that is subject of this action during the Class Period are as follows:

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| 100 | RGF | Buy | 4/15/04 | $ 29.91 |
| | | | | |
| | | | | |

Please list other transactions on a separate sheet of paper, if necessary.

Plaintiff has sought to serve as a class representative in the following cases within the last three years:

Plaintiff will not accept any payment serving as a representative party on behalf of the class beyond Plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this  2nd  day of May , 2005

Signature _Jeffrey P. Jannett_
                                    Jeffrey P. Jannett

Address:  5601 Wing Lake Road

City/County: Bloomfield Hills, MI 48301-1252
Phone: 248-866-0881